UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Ronald G. Spangler, et al.,                                    Case No. 3:16-cv-1105

              Plaintiff

     v.                                                     MEMORANDUM OPINION
                                       AND ORDER

Jim F. Spangler, et al.,

              Defendants

## I.    INTRODUCTION

Before me is the motion for summary judgment filed by Defendants Rapid Machine Inc.,

Jerelyn S. Spangler, and Jim F. Spangler.  (Doc. No. 38).  Plaintiff Ronda Tulloch, personal

representative of the estate of deceased Ronald G. Spangler, filed a memorandum in opposition to

Defendants' motion.  (Doc. No. 42).  Defendants filed a reply.  (Doc. No. 52).

## II.    BACKGROUND

In 1978, Ron and Jim Spangler started a tool and die business together in Camden,

Michigan.  In 1984, they incorporated this business in Ohio as Spangler Superior Tool Mfg., Inc.[1]

Jim owned 51% of Spangler's real estate and shares, and Ron owned the remaining 49%.

Although Jim observed that Ron had become an alcoholic by the late eighties, "Ron was

shoulder to shoulder with [Jim] on every move [they] made" in Spangler until 1991 or 1992.  (Doc.

No. 39-1 at 4-5).  After that time, Ron progressively declined and began showing up to work

smelling of alcohol.  (*Id.*).  Then, in 2001, Ron was diagnosed with prostate cancer.  (*Id.* at 5).  After

---

[1] Because Ron was a resident of Michigan, Plaintiff Ronda Tulloch, personal representative of Ron's estate, is also a citizen of Michigan.  28 U.S.C. § 1332(c)(2).  Defendants are citizens of Ohio.

taking a leave of absence due to his illness, Ron came back to work "worthless" and "hooked on Vicodin." (*Id.* at 5, 14). Ron failed to show up for work every day he was supposed to and, when he did, Ron "reek[ed]" of alcohol. (*Id.* at 5). Because of this, Jim eventually fired Ron in 2006. (*Id.*). Jim offered to buy Ron out of his interest in Spangler at the time, but Ron refused. (*Id.*).

The relationship between the two brothers tracked the "downhill slope" of Ron's decline. (*Id.*). Jim resented the fact that Ron was not contributing to their jointly-owned business. Therefore, in 2003, Jim incorporated his own business, Bridgewater Machine, because he "wasn't going to build a business up that benefitted [Ron] when [Ron] was not putting anything into it." (Doc. No. 39-1 at 12, 14). Bridgewater was the "same kind of business" as Spangler and operated out of the same shop. (*Id.* at 14). "[T]he only work Bridgewater [did] was work [Jim] sublet from Spangler's to Bridgewater." (*Id.* at 15).

Beyond directing Spangler work to Bridgewater, Jim also arranged for Spangler to lease Bridgewater-owned equipment. (*Id.* at 14-15, 30). Although Spangler initially leased the equipment at a fifty-percent discount, when Spangler became "more capable of making the full payment" in 2012, Spangler began making the full payments. (*Id.* at 30). At that time, Spangler also issued a payment of $25,000 "to partially make up for the back rent on equipment." (*Id.*).

With Spangler becoming more and more profitable under his direction, Jim was unhappy that Ron was profiting from his hard work and sought ownership of the entire company. First, after learning of Ron's divorce, Jim tried to buy Ron's ex-wife out of her 24.5% share of Spangler she received during the divorce. (*Id.* at 5). Although she initially resisted, demanding a higher price than Jim was offering, Jim eventually purchased her interest in 2013. (*Id.* at 5-6). Specifically, Jim made a one-time payment of $82,000 – $41,000 for the real estate and $41,000 for the shares. (*Id.* at 6).

Jim offered the same deal to Ron at least twelve times, but Ron refused. (*Id.* at 8, 31). This angered Jim because Ron was continuing to collect a rent charge of $600 per month, even though he

was not contributing to the business. Jim's feelings are memorialized in the May 2, 2014 Spangler

Board Meeting Minutes, stating:

> There will be no rent change and no dividends issued. It is Jim Spangler's wishes
> that the company will never pay a dividend, as long as anyone other than Jim owns
> stock in the company. Also Jim does not want any changes to the rent now or when
> he is no longer here.
>
> Ron Spangler will not cooperate in selling his portion of the business or building.
> He also puts nothing into the business or makes any contact with the business
> whatsoever. Due to this no rent changes should ever be made. The company has
> solely paid for the building additions, and Ron has put nothing into the business,
> therefore Ron will not benefit with any rents increases.

(*Id.* at 33).

At this time, in 2014, Ron was nearly a year in to his battle with throat cancer that would

eventually take his life. Because of his illness and a prior injury, Ron experienced chronic pain. To

ease this pain, Ron's daughter, Plaintiff Ronda Tulloch, testified that Ron applied a 100mg Fentanyl

patch every 72 hours, took Percocet, Vicodin, and Excedrin, and also used a morphine mouthwash.

(Doc. No. 42-1 at 2). Other than prescribed medications, Ron also self-medicated with

approximately half a gallon of whiskey every two to three days and a case of beer every five days.

Between this cocktail, his illness, and possible senility, Ron needed help to perform daily activities,

even though he was living alone. Ronda recalled that Ron would forget to pay bills, pay bills twice,

and order things over the phone, forgetting he had done so by the time they arrived.

Despite Ron's deteriorating condition, Jim claims he did not know of Ron's illness at the

time Ron allegedly agreed to a buyout and they negotiated the terms of this buyout over the course

of three to four weeks. In fact, Jim testified that Ron seemed to be especially cleaned up and "stone

sober" on the day of contracting, June 11, 2015. (Doc. No. 39-1 at 12). Jim's wife, Defendant

Jerelyn Spangler, also claimed Ron looked "exceptionally good" and sober. (Doc. No. 39-2 at 19).

On this day, Jim picked up Ron from his house in Michigan and took him to the Spangler

shop to sign the closing documents. (Doc. No. 39-1 at 12). Rather than using an attorney to draw

up these documents, Jerelyn drafted them herself, using as reference the documents an attorney had drafted for the sale of Carol's interest. (Doc. No. 39-2 at 14).

Under the terms of the Agreement, Ron would sell Jim his interest in Spangler's real estate and shares for a "purchase price" of $79,950. (Doc. No. 39-1 at 36). Specifically, Ron would forfeit his ownership rights on the day of contracting for the down payment price of $9,950 – $7,500 for his real estate interest and $2,450 for his shares at a rate of $100 per share. (*Id.* at 36, 38). Pursuant to the Promissory Note, independently drafted by Jerelyn as no similar payment system was used in Carol's sale, the remaining $70,000 would be paid to Ron in $1,000 monthly installments. (*Id.* at 39). The Promissory Note also stated the $70,000 balance would be considered paid in full at the time of Ron's death and no further unpaid balance would be paid to Ron's estate. (*Id.*).

Ron did not consult with his children or an attorney before signing theses documents. Because Ronda lived in Florida, she did not learn of the sale until she returned to Michigan in the fall of 2015 while helping her father with his bills. At this time, she discovered the $9,950 down payment Jim had paid to Ron as well as the closing documents. When she questioned Ron about this, Ron said he had hidden the documents at Jim's request and advised that his understanding of the transaction was that "he was merely authorizing an increase in rent that he would receive each month from $600 to $1,000" because of the profitability of the company. (Doc. No. 42-1 at 3). After Ronda's explained the true nature of the transaction, Ron became angry.

Meanwhile, Jim was in the process of merging Spangler and Bridgewater into a new company – Defendant Rapid Machine Inc. – owned by himself and Jerelyn. This merger was announced less than a week after Jim bought Ron out of Spangler. (Doc. No. 39-1 at 41).

Although Ron filed suit contesting the legality of the buyout agreement in May 2016, Ron succumbed to his illness on August 28, 2016. Because payments on the Promissory Note ended at the time of Ron's death and were paid on the first of the month, Jim paid only $22,950 for Ron's

interest in Spangler.  At the time of contracting, Ron's 24.5% interest in Spangler was worth at least $275,538.76 because: (1) Spangler's real estate was appraised for $360,000 prior to improvements made in 2012 and 2014; and (2) Spangler's shareholder's equity was $764,648 in 2014 and $1,044,811 in 2015.  (Doc. No. 39-1 at 9).  Because Ron would have been paid $7,800 in rent charges for the same period absent the buyout agreement, Ron profited only $15,150 from selling his interest in a company, which he refused to sell for years.

## III.    STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor.  *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).  A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).  Ohio substantive law governs here.

## IV.    DISCUSSION

In the Amended Complaint, Ronda asserts the following eight causes of action: (1) incapacity to contract; (2) unconscionable contract; (3) silent fraud; (4) civil conspiracy; (5) usurpation of corporate opportunity; (6) breach of duty of loyalty and good faith; (7) voidable contract – patent ambiguity; and (8) fraud in inducement.  (Doc. No. 18).  Jim and Jerelyn move for summary judgment on all claims.  (Doc. No. 38).

## A. Incapacity

"Among the essentials of every contract are two competent contracting parties, and mutuality of obligation." *Payne v. Thompson*, 5 N.E. 654, 656 (Ohio 1886); *Hosler v. Beard*, 43 N.E. 1040 (Ohio 1896). As such, contractual capacity is an essential element of an enforceable contract. *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002).

"An individual who has not been adjudicated as mentally incompetent in a court of law is presumed to be in fact competent." *Buzzard v. Pub. Emps. Ret. Sys. of Ohio*, 745 N.E.2d 442, 445 (Ohio Ct. App. 2000). But this presumption can be rebutted, and the contract found voidable, if the "party seeking to void a contract because of lack of mental capacity" can show a lack of mental capacity "by clear and convincing evidence." *Giurbino v. Giurbino*, 626 N.E.2d 1017, 1026 (Ohio Ct. App. 1993) (citing *Willis v. Baker*, 79 N.E. 466 (Ohio 1906)); *see also Davis v. Marshall*, No. 94APE 02-158, 1994 WL 425169, at *3 (citing *Hosler*, 43 N.E. 1040). Therefore, to defeat summary judgment, Ronda must set forth evidence "'which will produce in the mind of the trier of facts a firm belief or conviction'" that Ron lacked mental capacity at the time he signed the documents. *Henderson v. Chesapeake Exp. LLC*, No. 5:18CV1284, 2019 WL 7372319, at *5-*6 (N.D. Ohio Dec. 31, 2019) (quoting *Cross v. Ledford*, 120 N.E.2d 118, 123 (Ohio 1954)).

Under Ohio law, a person is incompetent if he "is so mentally impaired, as a result of a mental or physical illness or disability, … or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property." O.R.C. § 2111.01(D)(1). Ohio law also recognizes that intoxication can make one legally incompetent to contract. *Baird v. Howard*, 36 N.E. 732, 734-35 (Ohio 1894).

"The proper test for mental competency to contract is whether the person claimed to be incompetent understood the nature of the transaction and the effects of his or her own actions." *Giurbino*, 626 N.E.2d at 1026. Ronda claims Ron lacked capacity to contract due to "senility, chronic

pain, and intoxication from the use and misuse of mind-altering pain and other medications he was taking for complications related to terminal jaw cancer." (Doc. No. 42 at 7).

Ronda testified that, at the time the documents were signed, to relieve chronic pain caused by his throat cancer and a back injury sustained in his 30's,

> Ron was on a 100 mg. Fentanyl patch, which had to be replaced every 72 hours. For additional pain management, he was on Percocet, Vicodin, a Morphine mouthwash, and Excedrin. In addition to his heavy pain medication, Ron was taking Fluoxetine for depression and anxiety, and Ambien to help him sleep.

(Doc. No. 42-1 at 2). In addition to his prescribed medications, Ron was also "drinking about a half gallon of whiskey every two to three days and a case of beer every five days." (*Id.*).

Jim and Jerelyn admit they knew Ron was "hooked on Vicodin" and had been for some time. (Doc. No. 39-1 at 14; Doc. No. 39-2 at 20). They also admit to knowledge of Ron's alcoholism beginning as early as 1976. (Doc. No. 39-1 at 5; Doc. No. 39-2 at 10). In fact, Jerelyn testified that they knew Ron "was always on Vicodin," (Doc. No. 39-2 at 20), and Jim testified that almost every time he stopped by Ron's house, "except the last month before we signed [the documents], [Ron] was drunk." (Doc. No. 39-1 at 13).

Despite this, Jim and Jerelyn claim Ron was "stone sober" and did not appear to be under the influence of drugs or alcohol on the day he signed the documents. (Doc. No. 39-1 at 12; Doc. No. 39-2 at 19). Jerelyn noted that Ron looked "exceptionally good" that day and that she was "very surprised" he did not smell of alcohol. (Doc. No. 39-2 at 19). Jim and Jerelyn also claim that, at the time of contracting, they did not know Ron was on any other pain medications at the time or that he even had cancer, even though he had been diagnosed two years prior. (Doc. No. 39-1 at 13; Doc. No. 39-2 at 20).

Ultimately, the only evidence supporting a finding that Ron was "stone sober" at the time of contracting and during negotiations is Jim and Jerelyn's own testimony. In light of the fact that this is inconsistent with Ron's prescribed and self-medicated regimen at the time as well as Defendants'

own testimony of Ron's chronic alcoholism and addiction to Vicodin, a credibility determination remains for the jury. *See* 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure*, § 2726 (4th ed. 2019) ("A similar problem involving credibility arises when the knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment. … Courts have been reluctant to deprive the nonmoving party of the opportunity of testing the credibility of the movant or the movant's witnesses in open court in this context.") (citations omitted).

Beyond possible intoxication alone, there is evidence that Ron lacked capacity at the time of contracting due to senility, his illness, chronic pain, or otherwise. Specifically, Ronda testified that

> Ron would sometimes forget to change his Fentanyl patch, causing him to rage. He would threaten to kill himself and others, and was sent to the emergency room over medication-related behavioral issues two times in the last year of his life.
>
> He would also forget to take his Fluoxetine, causing him to suffer panic attacks and hyperventilating.

(Doc. No. 42-1 at 2). His forgetfulness extended beyond his medication alone. "Over the same period of time, Ron wasn't paying bills on time, was paying bills twice, and was buying things over the phone that he didn't want or need. He told me, 'I don't know how I keep getting this stuff.'" (*Id.*). Although Ron lived alone, Ronda claims he "needed help for the activities of daily living… and was checked on daily by his postal carrier and/or his adult children." (*Id.*).

This testimony is consistent with his out-of-character behavior of agreeing to sell his interest in Spangler after refusing at least twelve times before. The deal Ron eventually agreed to was much worse than the deal he had repeatedly refused. Specifically, under the previously offer, Ron would have been guaranteed $82,000. (Doc. No. 39-1 at 39-1 at 8). But, by signing the documents, Ron agreed to sell his share for *at most* $79,950 since $70,000 of the purchase price was conditioned on whether he lived an additional 70 months to receive all $1,000 monthly payments. (*Id.* at 36-40). If he did not, the remainder of the balance would not be paid to his estate, but instead the Promissory

Note would be deemed paid in full. (*Id.* at 39). Jim contends Ron insisted on this condition, (*Id.* at 11), which is bizarre in light of the strained relationship between the brothers and Ron's illness that would take his life only fourteen months later.

Further bolstering a conclusion that Ron did not understand the true nature and consequences of signing the documents are his statements made to Ronda several months later when she discovered the documents.[2] According to Ronda, Ron's "understanding of the documents was that he was merely authorizing an increase in rent that he would receive each month from $600 to $1,000. Jim said the reason for the increase was the increasing profitability of the Company." (Doc. No. 42-1 at 3). Ron told Ronda the $9,950 payment he received at the time of signing "was a 'bonus,' that he had 'signed some papers but nothing is final until it goes to an attorney.'" (*Id.*). After Ronda explained the true nature of the documents, Ron became angry. (*Id.*).

In sum, considering the evidence as a whole in the light most favorable to Ronda, a reasonable jury could conclude there is clear and convincing evidence to find Ron lacked capacity to

---

[2] Defendants contend these statements are not probative of Ron's mental state on the day of contracting, June 11, 2015, because they were made months later in "fall of 2015." (Doc. No. 52 at 2). Under Ohio law,

> Where the validity of an act is called into question on the ground of want of capacity on the part of one of the parties thereto, mental condition at the time of the act determines the capacity to act, and the evidence proffered to show incapacity must relate to the time of the act done, either directly or when taken in connection with other evidence in the case.
> The law does not require, however, that all testimony relative to mental condition relate to the exact time of the act. Evidence of mental and physical condition within a reasonable time before and after the act is admissible as throwing light on the party's mental condition at the time.

55 Ohio Jurisprudence 3d *Incompetent Person* § 218 (February 2020) (citations omitted). Although the contested statements were made months after the documents were signed, "taken in connection" with Ron's condition, prescribed and self-medication regimen, and the fact that his behavior on the day of contracting was starkly different than his normal behavior, these statements are probative of whether Ron understood the nature of the documents and consequences of signing them.

contract at the time the documents were signed. Because a genuine dispute of fact remains, summary judgment is denied.

## B.    Unconscionability

"A contract is unconscionable if it did not result from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." *Lake Ridge Academy v. Carney*, 613 N.E.2d 183, 189 (Ohio 1993) (internal quotation and citation omitted). "The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable." *Taylor Bldg. Corp. of Am. v. Benfield*, 884 N.E.2d 12, 20 (Ohio 2008). "A determination of whether a written contract is unconscionable is an issue of law." *Id.*

### 1.    Substantive Unconscionability

"An assessment of whether a contract is substantively unconscionable involves consideration of the terms of the agreement and whether they are commercially reasonable." *Hayes v. Oakridge Home*, 908 N.E.2d 408, 414 (Ohio 2009). "The factors to be considered vary with the content of the agreement at issue." *Id.* But the ultimate question is whether the terms of the contract were fair and reasonable. *DeVito v. Autos Direct Online, Inc.*, 37 N.E.3d 194, 200 (Ohio Ct. App. 2015).

By signing the documents, Ron's sold his 24.5% interest in Spangler and, in doing so, forfeited his $600 monthly rent income. In exchange, Ron received a down payment of $9,950 and would receive $1,000 monthly payments for the sooner of 70 months or the end of his life. The remaining balance would not be paid to his estate. Instead, "in the event of death of the Seller[, Ron], this Promissory Note will be considered paid in full." (Doc. No. 39-1 at 39). As such, under the terms of the documents, Ron would receive up to $79,950 by selling his share.

10

At the time, Ron's interest in Spangler was worth at least $275,538.76 because: (1) Spangler's real estate was appraised for $360,000 prior to improvements made in 2012 and 2014; and (2) Spangler's shareholder's equity was $764,648 in 2014 and $1,044,811 in 2015.  (Doc. No. 39-1 at 9).

Accordingly, under the terms of the documents, had Ron lived to see all 70 $1,000 monthly payments, he would have sold his share for 29% its worth.  As it happened, Ron succumbed to his cancer fourteen months after signing the documents.  Because payments were made on the first of every month, Ron received only thirteen payments.

Ultimately, what Ron had repeatedly refused to sell for $82,000, Jim purchased for only $22,950 – approximately 8% of its worth.  Because Ron would have received $600 monthly rent payments without the deal, he ultimately received a profit of $15,150 – the $9,950 down payment plus an addition $400 for thirteen months.

Considering these calculations and the clause relating to termination of payments on death in particular, I find the documents to be substantively unconscionable.

## 2.    Procedural Unconscionability

"Procedural unconscionability concerns the formation of the agreement and occurs when no voluntary meeting of the minds is possible."  *Porpora v. Gatliff Bldg. Co.*, 828 N.E.2d 1081, 1083 (Ohio Ct. App. 2005).  To determine whether a contract is procedurally unconscionable, the court considers factors such as "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question."  *Collins v. Click Camera & Video, Inc.*, 621 N.e.2d 1294, 1299 (Ohio Ct. App. 1993) (quotation omitted).

On the day of contracting, Jim picked up Ron at his home and brought him to Spangler premises to sign the documents. No attorneys were present at the time of contracting. In fact, no attorneys were used at any point during this transaction. Instead, Jerelyn drafted the documents.

Although Defendants claim Ron was given the opportunity to read the documents before signing them, there is evidence to suggest Ron lacked capacity to understand the documents, as discussed above. The only indication that the terms of the documents were discussed with Ron is Ron's statement later that, based upon Jim's representations, Ron believed he was merely authorizing an increase in his rent income from $600 to $1,000 and receiving a bonus due to the increased profitability of Spangler.

Considering this evidence in the light most favorable to the nonmovant, a reasonable factfinder could conclude the execution of these documents was procedurally unconscionable. Because the documents are substantively unconscionable as well, summary judgment is denied.

## C.    Fraud in the Inducement

Fraud, for purposes of avoiding a contract, "can come in one of two forms: fraud in the execution (also called fraud in the factum) or fraud in the inducement. Fraud in the execution results in a void agreement, whereas fraud in the inducement can result in a voidable agreement." *Kight v. Miller*, 94 N.E.3d 60, 70 (Ohio Ct. App. 2007) (citing *Haller v. Borror Corp.*, 552 N.E.2d 207, 210-11 (Ohio 1990)). "[I]n fraud in the inducement, the party to be charged understood the nature and consequences of the document signed (but was induced to sign based upon a misrepresentation); but in fraud in the execution, the party to be charged did not understand the nature of the document signed due to fraud by the other party during the execution." *Id.* (citing *Haller*, 552 N.E.2d at 210-11).

Ronda claims Jim and Jerelyn fraudulently induced Ron to sign the documents selling his share of Spangler. Specifically, Ronda claims that, at the time the documents were signed, Ron

believed they merely authorized an increase in his rent payments and did not understand that, by signing them, he was selling his share of Spangler. In support, Ronda restates her arguments regarding incapacity and unconscionability and alleges Ron arrived at his mistaken belief because of representations by Jim.

Ronda characterizes this claim as "fraud in the inducement." But because Ronda alleges Ron did not understand the nature and consequences of the documents, this is a claim of fraud in the factum, not fraud in the inducement.

As the Supreme Court of Ohio explained,

A release is obtained by fraud in the factum where an intentional act or misrepresentation of one party precludes a meeting of the minds concerning the nature or character of the purported agreement.… Where device, trick, or want of capacity produces " 'no knowledge on the part of the releasor of the nature of the instrument, or no intention on his part to sign a release or such a release as the one executed,' " there has been no meeting of the minds. *Picklesimer v. Baltimore & Ohio RR. Co., supra,* 151 Ohio St. at 5, 38 O.O. at 478, 84 N.E.2d at 216. In such cases the act or representation of one party against the other constitutes fraud in the factum and renders the release obtained void *ab initio.*

*Haller,* 552 N.E.2d at 210; *see also Baird,* 36 N.E. at 734 ("To secure the possession of property by means of a contract made with its owner by one who, at the time, knew him to be incapable of entering into a contract, constitutes a fraud.").

To defeat this claim of fraud, Jim and Jerelyn again rely only on their own testimony that Ron was "stone sober" and had the opportunity to review the documents on the day they were signed. (Doc. No. 38 at 13; Doc. No. 52 at 6). But, as discussed above, there is evidence to suggest Ron was never "stone sober" during this time and that he lacked capacity understand the nature and consequences of the documents at that time.

As discussed above, according to Ronda, Ron's "understanding of the documents was that he was merely authorizing an increase in rent that he would receive each month from $600 to $1,000. Jim said the reason for the increase was the increasing profitability of the Company." (Doc.

No. 42-1 at 3). Ron told Ronda the $9,950 payment he received at the time of signing "was a 'bonus,' that he had 'signed some papers but nothing is final until it goes to an attorney.'" (*Id.*). After Ronda explained the true nature of the documents, Ron became angry. (*Id.*).

Ronda only learned of the transaction after the fact. She claims Ron told her he had been hiding it because "'Jim said if I talked to you the deal would be off.'" (*Id.*).

Considering this evidence in the light most favorable to Ronda, a reasonable jury could conclude Ron did not understand the nature of the documents at the time they were signed due to "device, trick, or want of capacity." Therefore, a genuine dispute of material fact remains, and summary judgment is denied.

## D. Silent Fraud

To establish a claim of fraud, the plaintiff must show the following elements:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland, Inc.*, 514 N.E.2d 709, 712 (Ohio 1987).

Here, Ronda alleges Jim and Jerelyn committed "silent fraud" by failing to notify Ron of their intention to merge Bridgewater and Spangler before Ron sold his share of Spangler. (Doc. No. 42 at 13). Knowledge of this fact may have been material had Ron understood the nature of the documents and consequences of signing them. But, as discussed above, there is evidence to show he did not understand the nature of the documents he was signing. There is also evidence to show that Ron would never have sold his share of Spangler, regardless of any intention to merge.

Assuming Ron understood documents merely authorized an increase in his rent charges, as Ronda purports, there is no evidence to suggest Ron justifiably relied on the fact that Spangler would not merge with Bridgewater when signing the documents. Without more, I must conclude

there is no genuine dispute of material fact on this theory and grant summary judgment on this claim, accordingly.

## E.    Civil Conspiracy

"'Civil conspiracy' has been defined as 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transam. Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987)). To establish a civil conspiracy claim, Ronda must first show Jim and Jerelyn maliciously committed "[a]n underlying unlawful act." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). That is, Ronda must show they acted with "'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" *Id.* (quoting *Pickle v. Seinehart*, 166 N.E.2d 227, 229 (Ohio 1960)).

As discussed above, there is evidence that Jim and Jerelyn committed fraud in the factum when entering the contact with Ron, who was arguably incompetent at the time. Jerelyn drafted these documents containing substantively unconscionable terms. Jim picked Ron up from his home and brought him to sign these documents. There is also evidence to show Jim made misrepresentations regarding the contents of these documents to induce Ron to sign away his interest in Spangler to Jim at less than thirty percent of the amount it was worth. Considering this evidence, a reasonable jury could conclude Jim and Jerelyn engaged in a civil conspiracy. Therefore, summary judgment is denied.

## F.    Duty of Loyalty & Good Faith

"[A] close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market." *Crosby v. Beam*, 548 N.E.2d 217, 220 (Ohio 1989). Due to the nature of close corporations, "the fiduciary duty that majority shareholders owe to

minority shareholders is heightened … and is one of 'utmost good faith and loyalty.'" *Sennerikuppam v. Datel Eng'g Co., Inc.*, 156 F.3d 1232 (Table) (6th Cir. 1998) (quoting *Crosby*, 548 N.E.2d at 220); *see also United States v. Byrum*, 408 U.S. 125, 137-38, n.11 (1972). "Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable." *Crosby,* 548 N.E.2d at 221.

As opposed to the case relied on by Jim, Ron and Jim did not hold an equal interest in Spangler. At all times, Jim owned a majority share beginning with a 51% interest at the time the brothers incorporated Spangler to a 74.5% share at the time of contracting. Therefore, as the majority shareholder in this close corporation, Jim owed Ron the duty of "utmost good faith and loyalty."

Jim alleges he did not breach this duty because Ron was provided the Spangler financials. Even assuming Ron received and understood these financials, there is evidence to show Jim breached his fiduciary duty owed to Ron.

I again quote the May 2, 2014 Minutes of the Spangler Board of Directors:

There will be no rent change and no dividends issued. It is Jim Spangler's wishes that the company will never pay a dividend, as long as anyone other than Jim owns stock in the company. Also Jim does not want any changes to the rent now or when he is no longer here.

Ron Spangler will not cooperate in selling his portion of the business or building. He also puts nothing into the business or makes any contact with the business whatsoever. Due to this no rent changes should ever be made. The company has solely paid for the building additions, and Ron has put nothing into the business, therefore Ron will not benefit with any rents increases.

(Doc. No. 39-1 at 33). From this, a reasonable jury could conclude Jim's decision not to issue a dividend or increase rent was not made for a legitimate business reasons, but in spite for Ron's refusal to sell his interest. In fact, in his deposition, Jim admitted that these decisions he was making

were not in the interest of the shareholders, but to prevent Ron from profiting from the business. (*Id.* at 10).

Beyond this, there is evidence that as early of 2003, Jim had started putting his own interests before those of Spangler and, in turn, Ron. In 2003, Jim incorporated Bridgewater, the "same kind of business" as Spangler, operating out of the Spangler shop. (*Id.* at 12, 14). By his own testimony, Jim stated he did this because he "wasn't going to build a business up that benefitted [Ron] when [Ron] was not putting anything into it." (*Id.* at 14).

Acting as the president of Spangler, Jim then directed Spangler business to Bridgewater and decided that Spangler would pay Bridgewater to lease equipment. (*Id.* at 14-15). Although Spangler initially leased the equipment at a discounted rate, Spangler eventually made full payments to Bridgewater and issued a $25,000 check "to partially make up for back rent on equipment." (*Id.* at 30). From this, a reasonable jury could conclude Jim breached his heightened fiduciary duty by utilizing his majority control for his own benefit and preventing Ron from an equal benefit.

Considering the evidence as a whole, a genuine dispute of material fact remains as to whether Jim breached the duty of loyalty and good faith owed to Ron, as a minority shareholder in this close corporation. Therefore, Jim is denied summary judgment of this claim.

But, while Jim and Jerelyn are married, Jerelyn was not a shareholder of Spangler. As such, she owed no duty and is granted summary judgment on this claim.

## G.    Usurpation of Corporate Opportunity

"'The doctrine of corporate opportunity is a corollary of the undivided loyalty rule. The rule, which prohibits a director or officer from placing himself in a position of conflicting loyalties and subsequently violating his primary duty to the corporation, naturally prevents the director from appropriating an opportunity from the corporation.'" *Prodan v. Hemeyer*, 610 N.E.2d 600, 606 (Ohio

Ct. App. 1992) (quoting *Michals Enters., Inc. v. Alexandrou*, No. 48016, 1984 WL 3617, at *2 (Ohio Ct. App. Nov. 21, 1984)).

To establish a usurpation of corporate opportunity claim, the corporation must show: "(1) the officer or director acquired information about the opportunity while acting for the corporation; and (2) the opportunity is in the corporation's line of business." *Id.* (citing *Hubbard v. Pape*, 203 N.E.2d 365 (Ohio Ct. App. 1964)). "Where evidence of the usurpation of corporate opportunity is presented, 'the fiduciary bears the burden of establishing that an opportunity in the corporation's line of business is unavailable to it because of the wishes of the offeror.'" *Id.* (quoting *Michals Enters., Inc.*, 1984 WL 3617, at *2).

Here, as discussed above, Jim incorporated Bridgewater Machine in 2003 while he was President of Spangler. Despite Bridgewater being the "same kind of business" as Spangler and operated out of Spangler's shop, (Doc. No. 39-1 at 12, 14), Jim now contends "Bridgewater never entered into any agreement that could have been entered into by Spangler Tool." (Doc. No. 52 at 5). But, by Jim's own testimony, "the only work that Bridgewater done was work that [he] sublet from Spangler's to Bridgewater." (Doc. No. 39-1 at 15). This evidence suggests that not only was Bridgewater's business in Spangler's line of business, but also that Jim acquired information about this business in his capacity as Spangler President. Because Bridgewater's business *was* Spangler's business, Jim cannot show Bridgewater's business was not unavailable to Spangler because of the wishes of the offeror. Therefore, a genuine dispute of material fact remains, and Jim is denied summary judgment.

Unlike the duty of loyalty claim discussed above, Jerelyn is also denied summary judgment of this claim. This is so because, at all relevant times, Jerelyn was an officer of Spangler, and there is evidence that she endorsed the relationship with her husband's business, Bridgewater. (Doc. No. 39-1 at 26-30, 32-33, 41-43).

### H.    Patent Ambiguity

Under Ohio law, "contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 376 (Ohio 1974). Should the terms of the contract fail to show an objective meeting of the minds, the contract may not be enforced. *See 216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008) (Ohio law requires "that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous."); *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) ("A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."). But, when construing a contract, the court

> should attempt to harmonize all the provisions rather than produce conflict in them. See *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834. To that end, no provision of the contract should be ignored as inconsistent if there exists a reasonable interpretation which gives effect to both. *Expanded Metal Fire–Proofing Co. v. Noel Constr. Co.* (1913), 87 Ohio St. 428, 434, 101 N.E. 348, 350. Moreover, to the extent we encounter an ambiguity in the contract, that ambiguity must be construed against the drafting party. *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 80, 40 O.O.2d 87, 89, 228 N.E.2d 304, 307.

*Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987).

As discussed above, there is evidence to show Ron lacked the capacity required to establish an objective meeting of the minds. But for purposes of this claim, I will assume he possessed the requisite capacity to contract.

Because Jerelyn was the drafting party, an ambiguity in the contract must be resolved against her. If the ambiguities cannot be resolved, the document will be found unenforceable.

Here, the Sales Agreement states:

> 2. Jim and Jerelyn Spangler agree to pay to Ronnie Spangler for Interest in the real estate described above and stock certificates in Spangler Superior Tool Manufacturing lnc. the total sum of 79,950 hereinafter referred to as "purchase price."
> 3. The total purchase price shall be allocated and payable as follows:

> a. Upon Ronnie Spangler's execution of this agreement and transfer of his 24.5 shares of stock in Spangler Superior Tool Manufacturing Inc., the sum of <u>100.00</u> per share.
> b. An additional sum of $<u>7500.00</u> as and for Ronnie Spangler's real estate interest; which sum shall be due and payable at such time as Ronnie Spangler executes and delivers a Warranty Deed to Jim and Jerelyn Spangler for Ronnie Spangler's real estate interest being transferred herein.
> 4. After receipt of the price of $<u>9950.00</u> Ronnie Spangler shall no longer retain any ownership interest, rights, or control in Spangler Superior Tool Manufacturing Inc., nor any ownership rights or control in the real estate conveyed herein.

(Doc. No. 39-1 at 36). The underlined amounts and the words "per share" in Paragraph 3(a) were handwritten. The Agreement does not mention the Promissory Note executed at the same time or account for the $70,000 price differential between the "purchase price" discussed in Paragraph 2 is and the "total purchase price" of Paragraph 3.

Considering the unaccounted difference between the "purchase price" and the "total purchase price," the Agreement was ambiguous. Construing this ambiguity against the drafting party, I conclude the purchase price was $79,950 and was not conditioned as described in the unincorporated Promissory Note. That is, as stated in the Agreement, Defendant was required to pay "the total sum of 79,950" for Ron's interest in Spangler Superior Tool Manufacturing Inc.

Because this difference can be resolved against the drafting party, the Agreement is not void on grounds of patent ambiguity. But, as discussed above, there is evidence to show it was unenforceable on other grounds.

## V.    CONCLUSION

For the foregoing reasons, I hereby grant in part, and deny in part, Defendants' motion for summary judgment. Specifically, Jerelyn is granted summary judgment on the count of breach of the duty of loyalty and good faith. Jim and Jerelyn are granted summary judgment on the silent fraud and patent ambiguity claims.

Jim and Jerelyn are denied summary on the claims of incapacity, unconscionability, fraud in the factum, civil conspiracy, and usurpation of corporate opportunity.  Jim is also denied summary judgment on the breach of the duty of loyalty and good faith claim (Doc. 38).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge